IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TANENA ANN MICHAUD,<br>　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>　　　Defendant. | )<br>)<br>)<br>)　Civil Action No. 1:13-301<br>)　Electronically Filed<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**

**I.　　Introduction**

Plaintiff Tanena Ann Michaud ("Michaud") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56.[1] ECF Nos. 13 & 16. For the reasons that follow, the Commissioner's motion for summary judgment (*ECF No. 16*) will be denied. Michaud's motion for summary judgment (*ECF No. 13*) will be denied to the extent that it requests an award of benefits but granted insofar as it seeks a vacation of the Commissioner's decision, and a remand for further proceedings. The Commissioner's decision will be vacated, and the case will be remanded for further consideration of Michaud's applications for DIB and SSI benefits.

---

[1] The Court acknowledges that judicial review under the Act is not governed by the standards generally applicable under Federal Rule of Civil Procedure 56. *Banks v. Shalala*, 43 F.3d 11, 13-14 (1st Cir. 1994); *Flores v. Heckler*, 755 F.2d 401, 403 (5th Cir. 1985). In this context, the procedure typically employed at the summary-judgment stage of litigation "merely serves as a convenient method under which both parties may present appropriate briefs in support [of] and in opposition to the[ir] respective positions." *Sumler v. Bowen*, 656 F.Supp. 1322, 1330 (W.D.Ark. 1987).

1

## II. Procedural History

Michaud protectively applied for DIB and SSI benefits on November 12, 2009, alleging that she had become "disabled" on April 8, 2006. R. 13, 31, 126, 133. Pennsylvania's Bureau of Disability Determination ("Bureau") denied the applications on March 15, 2010. R. 65, 71, 77, 83. Michaud responded on April 7, 2010, by filing a request for an administrative hearing. R. 91-92. On July 21, 2011, a hearing was held in Erie, Pennsylvania, before Administrative Law Judge ("ALJ") Alfred J. Costanzo. R. 28. Michaud, who was represented by counsel, appeared and testified at the hearing. R. 31-47. Frances N. Kinley ("Kinley"), an impartial vocational expert, provided testimony about the expectations of employers existing in the national economy. R. 47-52. In a decision dated August 8, 2011, the ALJ determined that Michaud was not "disabled" within the meaning of the Act. R. 13-24.

On October 5, 2011, Michaud sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council. R. 7-9. The Appeals Council denied the request for review on August 8, 2013, thereby making the ALJ's decision the "final decision" of the Commissioner in this case. R. 1. Michaud commenced this action on October 7, 2013, seeking judicial review of the Commissioner's decision. ECF Nos. 1-3. Michaud and the Commissioner respectively moved for summary judgment on March 7, 2014, and April 7, 2014. ECF Nos. 13 & 16. The motions for summary judgment filed by the parties are ripe for disposition and will be resolved in this memorandum opinion.

## III. Standard of Review

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision

is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). A United States District Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191(3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

4

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV. The ALJ's Decision

In his decision, the ALJ determined that Michaud had not engaged in substantial gainful activity subsequent to her alleged onset date. R. 15. Michaud was found to be suffering from fibromyalgia, degenerative disc disease of the lumbar and cervical spines, migraine headaches, and depression. R. 15-16. Her fibromyalgia, degenerative disc disease and migraine headaches were deemed to be "severe" under the Commissioner's regulations. R. 15; 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Michaud's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 16.

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ determined that Michaud had the "residual functional capacity"[2] to perform a restricted range of "light"[3] work. R. 16. Elaborating on Michaud's abilities and limitations, the ALJ explained:

> Specifically, the evidence supports that the claimant is capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting at least six hours out of eight and standing and/or walking two hours during an 8-hour workday. Occasionally, the claimant can perform postural activities requiring the ability to climb, balance, stoop, kneel, crouch and crawl; however, she can never push or pull with the upper extremities. In addition, she can engage in frequent, but not continuous or repetitive handling, fingering and feeling. The claimant can perform simple, routine, repetitive tasks with minimal public interaction due to pain.

R. 17. Michaud had "past relevant work"[4] experience as a home health aide. R. 159, 177. Kinley classified that position as a "semi-skilled"[5] job at the "medium"[6] level of exertion. R. 47. Since Michaud was deemed to be capable of performing only "unskilled"[7] work at the "light" level of exertion, it was determined that she could not return to her past relevant work. R. 23.

---

[2] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir. 1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

[4] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976.

[5] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. §§ 404.1568(b), 416.968(b).

[6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[7] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or

Michaud was born on August 31, 1977, making her twenty-eight years old on her alleged onset date and thirty-three years old on the date of the ALJ's decision. R. 23, 44, 126, 133. She was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). Michaud had a "limited education"[8] and an ability to communicate in English. R. 32, 157, 163; 20 C.F.R. §§ 404.1564(b)(3), (5), 416.964(b)(3), (5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Michaud could work as an office helper, a night patroller, a mail clerk, a telephone clerk, or an order clerk. R. 23-24. Kinley's testimony established that those jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).[9] R. 48-49.

V.  **Discussion**

Michaud dropped out of high school before completing the tenth grade. R. 32. Although she later began the process of obtaining her General Educational Development ("GED") certification, she never finished it. R. 32. During the two years immediately preceding her alleged onset date, Michaud worked as a home health aide. R. 159, 177.

On March 23, 2006, Dr. Kreig Spahn noted that Michaud had experienced "spontaneous and sudden" pain in the middle of her neck after slipping and falling to the ground. R. 381. Eight days later, Michaud was involved in an automobile accident. R. 509. She apparently crashed a minivan into another vehicle. R. 509. In the aftermath of the collision, Michaud was treated at the Meadville Medical Center in Meadville, Pennsylvania. R. 509-510. X-rays and

---

removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs." 20 C.F.R. §§ 404.1568(a), 416.968(a).

[8] An individual is deemed to have a "limited education" if he or she has completed anywhere from the seventh grade to the eleventh grade of formal schooling. 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).

[9] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

computed tomography ("CT") scans of her cervical spine yielded no evidence of a fracture. R. 509. An x-ray of Michaud's left hand revealed that her middle finger had been fractured. R. 378. A splint was provided to alleviate her pain. R. 509-510. Michaud was discharged in stable condition and instructed to see Dr. Spahn for follow-up care. R. 510. After examining Michaud on April 3, 2006, Dr. Spahn advised her to take a week off from work. R. 380.

Michaud stopped working as a home health aide in April 2006. R. 159, 177. One month later, she started to perform part-time duties as a private babysitter. R. 33, 159, 177. Dr. Donald L. Rezek, a treating neurologist, noted on July 14, 2006, that Michaud had been suffering from intractable migraine headaches. R. 401. One of those headaches had apparently left Michaud in bed for a period of ten days. R. 401. Medications were prescribed to alleviate her symptoms. R. 401. Dr. Rezek speculated that Michaud's headaches were "associated with neck tension." R. 401. Two months later, he observed that Michaud's medications were either causing undesired side effects or otherwise unhelpful. R. 400.

On January 5, 2007, Dr. Rezek reduced the dosage of Michaud's Topamax in order to eliminate certain side effects that had caused her to stop using it. R. 398. He also ordered a magnetic resonance angiogram ("MRA") of her brain. R. 398. The MRA, which was performed on January 12, 2007, yielded normal results. R. 367. A computed tomography ("CT") scan of Michaud's head performed on October 9, 2007, detected "no evidence of hemorrhage." R. 489. In November 2007, Michaud started to work as a part-time cook for a pizza shop. R. 33, 159, 177.

Michaud underwent a CT scan of her lumbar spine on January 31, 2008. R. 484. The test uncovered evidence of disc herniations. R. 484. Michaud later began a course of physical therapy. Terry Hemlock ("Hemlock"), a physical therapist, reported on April 7, 2008, that one

8

month of physical therapy had failed to improve Michaud's condition. R. 218. Michaud was discharged from the regimen and advised to begin a home exercise program. R. 218.

During the spring of 2009, Michaud was referred to the University of Pittsburgh Medical Center's Horizon Wellness Center for a functional capacity evaluation. R. 311, 313. The evaluation was completed by Amber Bates ("Bates"). R. 313. After completing the evaluation, Bates reported that Michaud was physically capable of performing certain lifting and carrying tasks at the "medium" level of exertion. R. 313. Although Michaud was found to be precluded from pushing and pulling, she was deemed to be capable of sitting and reaching on a "frequent" basis. R. 313. Bates further indicated that Michaud could engage in "constant" standing, overhead reaching, stooping, squatting and kneeling. R. 313.

On May 19, 2008, a magnetic resonance imaging ("MRI") scan of Michaud's cervical spine revealed that she was suffering from a "moderate degree of central canal stenosis." R. 471. This condition was specifically attributed to herniated discs. R. 471. Two days later, Michaud stopped working altogether. R. 158. In a subsequent letter to Dr. Spahn, Dr. Rezek stated that Michaud had been "fired" because of absences and productivity deficiencies caused by her "chronic back pain." R. 392. Dr. Spahn observed on May 30, 2008, that Michaud could not sit, stand, lie or walk. R. 284.

Dr. Rezek examined Michaud on October 3, 2008. R. 391. In a letter to Dr. Spahn discussing Michaud's condition, Dr. Rezek explained:

> I had the opportunity to see Tanena Elder in my neurology office today. As you know, she is a 31-year-old woman with a history of increasing problems with neck and shoulder pain. This has caused her to be disabled because of the severity of the symptoms. She has had increasing problems with falling. She has fallen six times since last year. She feels dizzy, her legs get weak, and she feels sick to her stomach. She describes her headaches as "not too awful bad." She continues to have back pain and shoulder pain.

9

R. 391. Michaud was advised to undergo an electromyogram ("EMG") and nerve conduction studies. R. 391. The tests were performed on October 30, 2008. R. 389. Dr. Rezek later described the results as being "unremarkable." R. 389. Despite the negative test results, Michaud continued to experience "aches and pains in her muscles and joints." R. 389.

During the spring of 2009, Michaud fell down a flight of stairs and bruised her tailbone. R. 388. The fall aggravated the pain in her head and back. R. 388. Michaud also experienced "increased pain down her right leg." R. 388. An EMG was later performed on her lower extremities. R. 388. The findings of the EMG were "within normal limits." R. 387.

Michaud returned to Dr. Rezek's office on July 30, 2009, complaining of "increasing numbness in her hands." R. 385. The numbness was particularly noticeable in Michaud's left hand. R. 385. Dr. Rezek found Michaud's symptoms to be indicative of carpal tunnel syndrome. R. 385. Two months later, Dr. Rezek suggested that Michaud's persistent headaches were related to her "cervical spine disease." R. 383. Michaud protectively applied for DIB and SSI benefits on November 12, 2009. R. 13.

On February 11, 2010, Dr. Rezek observed that Michaud could not "sit, stand or walk in any specific position" for long periods of time. R. 581. He noted that "[s]he ha[d] been on multiple medications in the past without significant improvement." R. 581. Dr. Rezek's examination revealed that Michaud had "significant paraspinal tenderness." R. 581. One month later, Dr. Rezek stated that Michaud's "back discomfort" was "interfer[ing] with her ability to function on a daily basis." R. 580.

Wendy Salsgiver ("Salsgiver"), an adjudicator working on behalf of the Bureau, concluded on March 11, 2010, that Michaud was physically capable of performing an unrestricted range of "light" work. R. 58-63. The next day, Dr. Douglas Schiller opined that

Michaud did not have a "severe" mental impairment. R. 516. The Bureau denied Michaud's applications for benefits on March 15, 2010. R. 65, 71, 77, 83.

Michaud returned to Dr. Rezek's office on May 6, 2010. R. 579. In a letter to Dr. Spahn describing the encounter, Dr. Rezek advised that Michaud was having difficulty "localizing and grasping" objects that she could not pick up without bending over. R. 579. Dr. Rezek explained that Michaud's symptoms were "somewhat less severe" when she lifted objects from a table. R. 579.

Throughout the summer of 2010, Michaud continued to experience numbness in her arms and legs. R. 576. She also suffered from severe pain in her head, neck and back. R. 570, 573. On January 6, 2011, Dr. Rezek informed Dr. Spahn that Michaud had started to use a cane. R. 568. An MRI scan performed on January 26, 2011, detected the existence of degenerative changes in Michaud's lumbar spine. R. 567. In April 2011, Dr. Rezek observed that the etiology of Michaud's pain was unclear. R. 565. He intimated that she was suffering from fibromyalgia. R. 565.

During an appointment with Dr. Rezek on May 19, 2011, Michaud complained that she was frequently "dropping things from her hands." R. 564. Dr. Rezek noted that Michaud was only able to walk with "the assistance of a cane." R. 564. He observed that "she tend[ed] to shift positions quite regularly" while sitting in a chair. R. 564. Dr. Rezek found Michaud's symptoms to be "most consistent with fibromyalgia or a similar condition." R. 564. As of June 16, 2011, Michaud's migraine headaches continued to "interfere with her ability to function." R. 563.

Dr. Rezek detailed Michaud's alleged functional limitations in a "medical source statement" dated July 5, 2011. R. 559-562. In his statement, Dr. Rezek asserted that Michaud

11

could lift or carry objects weighing "less than" ten pounds only on an occasional basis. R. 560. He indicated that she could sit for only five hours, and stand or walk for only two hours, during the course of an eight-hour workday. R. 560-561. Additional restrictions were identified with respect to Michaud's handling and reaching abilities. R. 561. Dr. Rezek suggested that exposure to fumes, odors, chemicals, gases, machinery, heights, and other workplace hazards could aggravate Michaud's symptoms. R. 562. He predicted that she would need to miss one day of work per week if she were to be employed on a full-time basis. R. 562. Kinley testified that no jobs existed in the national economy for an individual who needed to miss work at that frequency.[10] R. 51-52.

At the hearing, Michaud testified that she suffered from migraine headaches every other day. R. 36. She stated that she typically dropped objects weighing no more than a glass of water. R. 37. Michaud asserted that she had been using a cane for anywhere from six months to a year, and that she could walk only "a couple of steps" without her cane. R. 40-41, 45. When questioned about her daily activities, Michaud testified that her children had been doing all of her household chores since 2008. R. 38. She insisted that she had not attended family functions or her children's school-related activities during the previous two years. R. 42. Michaud attributed her depression to her ongoing pain and concomitant inability to care for her children. R. 44.

In determining Michaud's residual functional capacity, the ALJ declined to adopt all of the restrictions identified by Dr. Rezek. R. 22. While acknowledging that Salsgiver's assessment did not constitute a "medical opinion," the ALJ nevertheless accorded it "great

---

[10] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117]. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

12

weight." R. 22. Michaud appears to challenge both Salsgiver's qualifications and the ALJ's reliance on her opinion. ECF No. 14 at 11-13.

Relying on Social Security Ruling 96-6p, the ALJ referred to Salsgiver as a "medical consultant" whose opinion was entitled to some consideration. R. 22. He went on to state that her assessment did not constitute a "medical opinion." R. 22. These observations in the ALJ's decision render his analysis somewhat ambiguous. Under the Commissioner's regulations, certain "administrative findings of fact" that are "based on the evidence in [a claimant's] case" do not themselves constitute "evidence" of his or her ability to work. 20 C.F.R. §§ 404.1527(e)(1)(i), 416.927(e)(1)(i). In the documentary record of the challenged assessment, Salsgiver's signature appears under words reading, "adjudicator's signature." R. 62. The box for the "medical consultant's code" is blank. R. 62. In light of the ambiguity in the ALJ's decision and the uncertain nature of Salsgiver's qualifications, it is not clear whether Salsgiver's assessment constituted opinion evidence of Michaud's condition.[11]

Even if it is assumed (contrary to the statement appearing in the ALJ's decision) that the assessment constituted a "medical opinion," the decision denying Michaud's applications for benefits is not supported by substantial evidence. An opinion expressed by a treating physician does not inevitably bind the Commissioner on the issue of a claimant's residual functional capacity. *Brown v. Astrue*, 649 F.3d 193, 196, n. 2 (3d Cir. 2011). When the medical evidence is genuinely disputed, an administrative law judge is ordinarily "free to choose the medical opinion of one doctor over that of another." *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009). Nonetheless, the probative force of any medical opinion must be judged in relation to the evidentiary record as a whole. *Miller v. Commissioner of Social Security*, 172

---

[11] The ALJ was undoubtedly required to give some consideration to every medical opinion contained in the record. *Williams v. Sullivan*, 970 F.2d 1178, 1185, n. 5 (3d Cir. 1992). In his decision, however, the ALJ specifically stated that Salsgiver's assessment was "*not* a medical opinion." R. 22 (emphasis added).

13

F.3d 303, 304 (3d Cir. 1999). An assessment submitted by a nonexamining consultant will not normally constitute "substantial evidence" of a claimant's ability to work when it is contradicted by assessments prepared by a treating or examining physician. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008). Since Salsgiver never examined Michaud, her assessment did not provide the ALJ with a sufficient evidentiary basis for rejecting Dr. Rezek's opinion. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Furthermore, the ALJ was not permitted to rely on his own interpretation of raw medical data as a basis for discounting the limitations found by Dr. Rezek. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). Given that no physician opined that Michaud was physically capable of performing "light" work, the ALJ's finding to that effect is not supported by substantial evidence. *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986).

Some of the jobs identified by Kinley (and later relied upon by the ALJ) existed at the "sedentary"[12] level of exertion. R. 24, 49. In his decision, the ALJ stated that Dr. Rezek had limited Michaud to "sedentary work with additional restrictions." R. 22. When viewed as a whole, however, Dr. Rezek's assessment described an individual who was incapable of performing even "sedentary" work on a full-time basis. R. 559-562. Dr. Rezek indicated that Michaud could sit, stand and walk for a total of only seven hours per workday. R. 560-561. Kinley testified that no jobs existed in the national economy for an individual who needed to spend significant portions of the workday lying down. R. 52. An individual with the limitations described by Dr. Rezek would not be able to complete an eight-hour workday. For these

---

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

reasons, the ALJ's decision cannot be sustained on the basis of his alternative findings concerning the existence of "sedentary" jobs in the national economy.

The statutory provision authorizing the commencement of this action provides the Court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "An immediate award of benefits is appropriate only when the evidentiary record has been fully developed, and when the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled." *Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010). That standard is not satisfied in this case. As discussed earlier, the record contains ambiguities relating to the qualifications of Salsgiver and the status of her opinion under the applicable regulations. Moreover, Michaud was never evaluated by a consultative examiner. Consultative examiners often bring a combination of expertise and impartiality to the adjudicatory process. *Hansford v. Astrue*, 805 F.Supp.2d 140, 149-150 (W.D.Pa. 2011). Unlike detached consultants, treating physicians are more likely to favor a finding of "disability." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Since further development of the record would facilitate a more accurate determination as to whether Michaud is "disabled," the proper remedy in this case is a remand for additional administrative proceedings rather than a judicially-ordered award of benefits.[13] *Diaz*, 577 F.3d at 504-507.

---

[13] Nothing in this memorandum opinion should be construed to mean that the Commissioner is *required* to order a consultative physical examination of Michaud on remand. The Court's observations concerning the lack of a consultative examination report are designed to illustrate why the *existing* record is not "fully developed." *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). Medical evidence postdating the issuance of the ALJ's decision may render a consultative physical examination unnecessary. Since Michaud's insured status expired on June 30, 2008, an examination performed in connection with the upcoming administrative proceedings may lack probative value as to whether she is entitled to benefits under Title II. The propriety of a consultative physical examination is a matter for the Commissioner to decide. 20 C.F.R. §§ 404.1519-404.1519b, 416.919-416.919b. In any event, a decision to reject the opinions expressed by Michaud's treating physicians cannot be based solely on an administrative law

15

A claimant must be insured for benefits in order to obtain an award under Title II. 42 U.S.C. § 423(a)(1)(A). Michaud was insured for benefits only through June 30, 2008. R. 13, 15, 174. The expiration of a claimant's insured status does not affect his or her eligibility for SSI benefits under Title XVI. *Bowen v. Galbreath*, 485 U.S. 74, 76, 108 S.Ct. 892, 99 L.Ed.2d 68 (1988). The record indicates that Michaud's condition deteriorated during the period of time elapsing between her alleged onset date and the date of the ALJ's decision. For instance, Michaud apparently started to use a cane at some point in late 2010 or early 2011. R. 40-41, 568. It is certainly conceivable that Michaud may be able to establish her entitlement to SSI benefits even if she is not entitled to receive benefits under Title II. Nevertheless, Michaud stopped working on May 21, 2008, after experiencing an exacerbation of her symptoms. R. 158. Even though Michaud had only been working on a part-time basis, she was evidently "fired" because her "chronic back pain" had rendered her unable to meet the expectations of her employer.[14] R. 392. Consequently, the record could potentially support a determination that Michaud became "disabled" at some point prior to June 30, 2008. Evidence postdating the expiration of a claimant's insured status may shed light on his or her condition during the insured period. *Reilly v. Office of Personnel Management*, 571 F.3d 1372, 1380-1383 (Fed.Cir. 2009); *Pollard v. Halter*, 377 F.3d 183, 193-194 (2d Cir. 2004). The Court expresses no opinion as to whether Michaud is "disabled" within the meaning of the Act, or as to whether any such

---

judge's independent interpretation of "objective medical evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

[14] One week before Michaud's discharge, Dr. Spahn suggested that Michaud could perform "medium" work. R. 267. Dr. Spahn's observation was based on the findings of the functional capacity evaluation performed by Bates. R. 267, 311, 313. The ALJ did not discuss that evidence in his decision. R. 13-24. The Court cannot make "additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ." *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005). At this stage, it suffices to say that the relationship between the functional capacity evaluation, Dr. Spahn's observation, the termination of Michaud's employment, and the subsequent expiration of Michaud's insured status will need to be ascertained by the Commissioner in the first instance.

"disability" began early enough to justify the provision of Title II benefits. Those issues must be addressed by the Commissioner on remand.[15]

## VI. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment (*ECF No. 16*) will be denied. Michaud's motion for summary judgment (*ECF No. 13*) will be denied to the extent that it requests an award of benefits but granted insofar as it seeks a vacation of the Commissioner's decision, and a remand for further proceedings. The Commissioner's decision will be vacated, and the case will be remanded for further consideration of Michaud's applications for DIB and SSI benefits. The Commissioner must "reopen and fully develop the record" before determining whether Michaud is "disabled" within the meaning of the Act. *Thomas v. Commissioner of Social Security Administration*, 625 F.3d 798, 800 (3d Cir. 2010). An appropriate order will follow.

s/ Arthur J. Schwab  
Arthur J. Schwab  
United States District Judge

cc: All Registered ECF Counsel and Parties

---

[15] Since the record contains objective evidence of impairments that could reasonably be expected to cause the symptoms described by Michaud, the Commissioner must give "serious consideration" to Michaud's subjective complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir 1993). It is worth noting that Michaud's testimony appears to be consistent with the information contained in Dr. Rezek's letters to Dr. Spahn. R. 36-47, 563-569. Nonetheless, the Commissioner is not necessarily required to credit Michaud's testimony in every respect. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 363 (3d Cir. 2011).